**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Danny Hernandez,<br><br>    Petitioner,<br><br>v.<br><br>Charles L Ryan, et al.,<br><br>    Respondents. | No. CV-15-01266-PHX-DGC<br><br>**ORDER** |

Petitioner Danny Hernandez filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on July 7, 2015. Doc. 1. Petitioner then filed an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on August 11, 2015. Doc. 7. The Court referred the petition to Magistrate Judge Deborah M. Fine. Doc. 3. On November 30, 2016, Judge Fine issued a report and recommendation that the Court dismiss the petition as untimely ("R&R"). Doc. 23. Petitioner filed pro se objections to the R&R. Doc. 24. For the reasons set forth below, the Court will overrule his objections and adopt Judge Fine's recommendation.

**I.  Background.**

    **A.  Petitioner's Conviction.**

The Arizona Court of Appeals provided the following summary of Petitioner's conviction:

> Hernandez lived in an apartment with his girlfriend, her mother ("Grandmother"), and the eight-month old victim, Angelica. Hernandez and his girlfriend were Angelica's parents. Janson "Jay" Simms, a

homeless person, lived in the apartment temporarily at the invitation of Grandmother.

The week before the events giving rise to the charges, Angelica appeared fine as she visited with her great-grandparents. She did not typically cry, but had been crying sporadically because of teething pain. On the morning of the crime, Grandmother awakened and played with Angelica, who acted fine. Grandmother then drove Angelica's mother to work and returned home. She played with Angelica again, who continued to seem fine. Grandmother eventually went to work at approximately 9:30 that morning. When she left the apartment, Angelica was in the bedroom with Hernandez. When Grandmother called home between approximately 11:30 and noon to check on Angelica, there was no answer. She called again a few minutes later and spoke to Hernandez, who stated that he had been home all morning but did not hear the telephone ringing. As she spoke to Hernandez, Grandmother heard Angelica crying in the background. She described the crying as a "fussy, hurting type [of] crying," which she attributed to teething, although Angelica had not been crying, nor was she "fussy," before Grandmother went to work.

At approximately 12:30 p.m., law enforcement officers were called to the apartment complex to check on a report of a crying baby. The officers did not locate the child. As the officers walked through the complex, they encountered Simms, who was returning to the second floor apartment. Although asked, Simms could provide no information regarding a crying baby.

Simms entered the apartment, where he observed Hernandez take Angelica to the bedroom. A few minutes later, Simms entered the bathroom. While Simms was inside, Hernandez began to bang on the bathroom door, saying that Angelica had stopped breathing. Simms ran to Angelica and, believing she was choking, placed her over his shoulder and began applying percussions to her back. She spit up mucous and blood. Simms placed Angelica on the sofa and told Hernandez to call 911. Hernandez replied, "[n]o, don't call 911, get her to breathe." Simms called 911. As he did so, he recalled meeting the officers downstairs. Simms then ran out of the apartment onto the balcony and called for help. The officers heard him and responded by running upstairs to the apartment, where they found Angelica laying on a sofa and Hernandez standing behind it.

Because Angelica was blue and had no pulse, the officers performed CPR until medical personnel arrived. The baby was thereafter taken to the hospital, where she was diagnosed with hypoxic eschemic encephalopathy.

> At trial, medical personnel described this condition as an injury to the brain due to lack of oxygen, caused when her heart stopped and she stopped breathing. The State also elicited testimony that eight-month-old children typically do not stop breathing for no reason, nor do their hearts usually stop for no reason. It would take a three to five minute deprivation of oxygen to stop an infant's heart. Medical personnel found no evidence of any infarction or other medical reason that could have caused Angelica's condition.
>
> Angelica also had a fractured clavicle and a severely fractured right arm that had recently occurred. Medical experts opined that an eight-month-old child could not have caused this type of fracture. Angelica also had petechial hemorrhaging on her face. The presence of these hemorrhages suggested that Angelica had been suffocated. Additionally, the brain injury was consistent with suffocation, as was the fact that blood was present in Angelica's mouth. No other explanation was given for Angelica's brain injury.
>
> Angelica never regained consciousness and died five days after her admission to the hospital. The medical examiner opined that the arm fracture was not a result of accidental trauma, but was an inflicted injury. The cause of death was determined to be anoxic encephalopathy due to smothering. The manner of death was ruled a homicide.
>
> At the time of the crime, Hernandez knew he had an outstanding arrest warrant. Therefore, he concealed his true identity and gave the investigating officers the wrong name throughout their investigation. At the request of Angelica's mother, Grandmother misidentified Hernandez as well. At the time of Hernandez's arrest, approximately one year after Angelica's death, he provided several false names to investigating officers and signed a false name to his fingerprint card.

Doc. 17-2 at 131-35 (citations omitted).

After a transfer from juvenile court, Petitioner was charged in Maricopa County Superior Court with first degree murder, child abuse, forgery, and false reporting to a law enforcement agency. *Id.* at 2; Doc. 17 at 7. Several charges were dismissed by the trial court, and Petitioner went to trial on charges of first-degree murder and child abuse. *Id.* A jury found Petitioner guilty of one count of second degree murder, a dangerous crime against children in the first degree and a class one felony, as well as two counts of

reckless child abuse, class three felonies. Doc. 17-2 at 7-9, 21. During sentencing, the trial judge considered several aggravating factors, including the brutality of the murder and the victim's age. *Id.* at 22. The judge also considered Petitioner's apparent history of abuse of the infant prior to the murder, continued involvement in criminal activity after the murder, disregard for terms of past releases, and a long juvenile criminal history, among other circumstances. *Id.* The judge sentenced Petitioner to 27 years, the maximum aggravated term, for the second degree murder. *Id.* at 23. The judge sentenced Petitioner to 7 years on each child abuse conviction, one to run consecutively to and the other to run concurrently with the second degree murder term. *Id.*

Petitioner timely appealed. *Id.* at 30. He argued that the trial court erred by: (1) not granting Petitioner a judgment of acquittal; (2) admitting Petitioner's outstanding warrants; (3) admitting Petitioner's subsequent arrest on unrelated charges; and (4) admitting out of court statements of Janson Simms. *Id.* at 35. The Court of Appeals confirmed Petitioner's conviction on December 24, 2001. *Id.* at 130. Petitioner alleges that he filed a petition for review with the Arizona Supreme Court, but presents no evidence of such a petition. Doc. 23 at 5.

**B.    State Post-Conviction Proceedings.**

Through counsel, Petitioner filed three separate petitions for post-conviction relief ("PCR") in the Superior Court. Doc. 23 at 5. No relief was granted. Petitioner's first petition was filed on January 25, 2002. The trial court denied relief on March 5, 2003, and the Arizona Court of Appeals and Arizona Supreme Court denied Petitioner's petition for review on March 24, 2004 and September 24, 2004, respectively. Petitioner filed the second petition on January 19, 2005. The trial court denied relief and Petitioner's motion for reconsideration. A petition for review to the Court of Appeals was denied on April 27, 2006, and Petitioner did not file a petition for review with the Supreme Court. Finally, on October 24, 2011, Petitioner filed his third PCR petition. This Petition claimed, among other things, that Petitioner had newly discovered evidence – a 2009 report and 2010 affidavit from Dr. Jonathan Arden concerning the victim's

injuries and Sudden Infant Death Syndrome ("SIDS"). The trial court dismissed the third PCR petition, and, on December 3, 2013, the Arizona Court of Appeals denied review. The Arizona Supreme Court also denied review on July 25, 2014. Doc. 23 at 6-8.

### C. The Petitioner and the R&R.

Petitioner filed a habeas petition raising four grounds for relief: (1) Petitioner's sentence was unconstitutionally enhanced because he was not allowed to present mitigating evidence and the judge incorrectly applied non-existent aggravating factors and first degree murder statutes during sentencing, even though the jury convicted Petitioner of second degree murder; (2) Petitioner received ineffective assistance of counsel during both his trial and appeal; (3) the prosecutor engaged in misconduct by using evidence gathered by Detective Armando Saldate, who has a history of perjury and falsifying evidence; and (4) there is newly discovered evidence of a medical examination by Dr. Jonathan Arden which shows that Petitioner is actually innocent. Doc. 7 at 6-9.

Judge Fine concluded that Petitioner's claims were barred by the one-year statute of limitations under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Doc. 23. Additionally, Judge Fine concluded that equitable tolling should not be applied to Petitioner's claims, and that he had not made a colorable claim of actual innocence. *Id.*

### D. Petitioner's Objections.

In his written objections, Petitioner argues that (1) his claims are not barred by the statute of limitations; (2) he is entitled to equitable tolling if his claims are barred; and (3) he is actually innocent and should be granted an evidentiary hearing. Doc. 24. The Court reviews Petitioner's objections de novo; the portions of the R&R to which he does not object will be adopted without further discussion. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).

## II. Analysis.

### A. Statute of Limitations.

The AEDPA establishes a one-year statute of limitations for habeas petitions filed by state prisoners. 28 U.S.C. § 2244(d)(1). The limitation period generally begins to run when the state conviction becomes final "by the conclusion of direct review or the expiration of the time for seeking such review." § 2244(d)(1)(A). Where applicable, the limitation period can begin later, on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." § 2244(d)(1)(D).

The limitations period is subject to both statutory and equitable tolling. Statutory tolling is available for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." § 2244(d)(2). Equitable tolling is available where "extraordinary circumstances beyond a prisoner's control ma[d]e it impossible to file a petition on time." *Roy v. Lampert*, 465 F.3d 964, 968 (9th Cir. 2006). In addition, a petitioner is entitled to an equitable exception to the AEDPA's statute of limitations if he makes "a credible showing of actual innocence." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).

Petitioner argues that his petition is not time-barred because "an unlawful sentence constitutes fundamental error, that is not waived." Doc. 24 at 1. Petitioner cites no precedent that would support an exception to the statute of limitations for claims of fundamental error, and the Court is aware of none.

Nor does Petitioner appear to dispute that his federal habeas petition was filed more than one year after his conviction became final. Even if the Court assumes that Petitioner's PCR petitions constitute "properly filed application[s] for State post-conviction" review, 28 U.S.C. § 2244(d)(1), the statute of limitations will only be tolled during the period that these applications were actually pending.

Petitioner's conviction became final on January 28, 2002, 35 days after the decision of the Arizona Court of Appeals. *See* Ariz. R. Crim. P. 31.19(a) ("Within 30

days after the Court of Appeals issues its decision, any party may file a petition for review with the clerk of the Supreme Court"); *State v. Rabun*, 782 P.2d 737, 739 (1989) (holding that a 5-day extension should be applied when a notice is mailed to a party that is required to act). Petitioner's first petition for PCR was timely filed on January 25, 2002. Thus, the statute of limitations was tolled from that date until the Arizona Supreme Court denied review on September 23, 2004. Assuming without deciding that Petitioner's second PCR petition was timely and properly filed, this petition would also toll the statute of limitations from its date of filing – January 19, 2005 – until 35 days after the Arizona Court of Appeals denied review – May 31, 2006. Petitioner's third PCR petition was filed on October 24, 2011, more than five years after the limitations period began to run after termination of the second petition.

What is more, the third PCR petition was found to be precluded by the Arizona courts because it was successive and did not satisfy any of the exceptions to preclusion in Arizona Rule of Criminal Procedure 32.2(b). A state petition for PCR that is untimely or successive is not considered "properly filed" and thus cannot toll the statute of limitations for a federal habeas petition. *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005) ("When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2).") (quotation marks omitted and alterations incorporated); *Bonner v. Carey*, 425 F.3d 1145, 1149 (9th Cir. 2005). Disregarding the third petition, more than 10 years passed between the termination of the second petition and filing of the federal habeas petition on July 7, 2015. Doc. 1.

In short, the one-year limitations period clearly expired after Petitioner's second PCR petition was terminated.

Petitioner also argues that, despite his exercise of due diligence, he was unaware before filing this habeas petition of several factual matters on which it is based. Doc. 24 at 11, 18-19. Specifically, Petitioner asserts that he did not realize he had been given an illegal sentence because he did not know that the judge had incorrectly applied first-degree murder statutes during sentencing. Doc. 7 at 6. But Petitioner was present at his

1  sentencing when the trial judge discussed the basis for the sentence.  Doc. 17-2 at 12.
2  Petitioner contends he was not provided with a transcript of his sentencing hearing
3  (Doc. 24 at 8), but he does not identify any efforts he made to obtain those transcripts.
4  What is more, Petitioner fails to identify the date or means through which he actually
5  learned of his alleged improper sentencing.  Petitioner has not shown that 28 U.S.C.
6  § 2244(d)(1)(D) governs the commencement of the limitations period for his unlawful
7  sentencing claim.  *See Miller v. Parties*, No. CV-16-01427-PHX-DGC (BSB), 2016 WL
8  7104868, at *2 n.5 (D. Ariz. Oct. 6, 2016) (concluding "that § 2244(d)(1)(D) does not
9  supply the starting date" for the statute of limitations when the factual basis on which the
10  underlying claims were predicated "was available at the time of trial, through the exercise
11  of due diligence," and "Petitioner does not identify the date on which he read the
12  transcripts that he alleges alerted him to his claims.").

13  Petitioner also alleges that, despite his due diligence, he did not learn of Detective
14  Saldate's history of perjury and presenting false evidence until "he saw the *Milke v. Ryan*
15  case on tv[.]" *Id.* at 11.  Judge Fine treated this as an argument for equitable tolling, but
16  the Court finds it is more properly considered as an argument for a later commencement
17  of the running of the statute of limitations.  Petitioner again fails to identify the exact date
18  on which he learned the facts about Saldate, but it is clear that Saldate's history of perjury
19  and presenting false evidence became public at least by March 14, 2013, when the Ninth
20  Circuit issued its opinion in *Milke v. Ryan*, 711 F.3d 998, 1001 (9th Cir. 2013).  The
21  Tenth Circuit has found that, "for a prisoner, a case is discoverable by 'due diligence' on
22  the date the opinion became accessible in the prison law library, not the date the opinion
23  was issued." *Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir. 2000).  Because
24  Plaintiff provides no evidence of when the prison library obtained a copy of *Milke*, the
25  Court will assume it did so shortly after the opinion was issued in 2013.  Petitioner did
26  not bring his federal habeas claim until July 7, 2015, more than two years after the Ninth
27  Circuit's decision.  Petitioner has not shown that he filed his habeas claim less than one
28  year after "the date on which the factual predicate of the claim . . . could have been

discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

The Court also agrees with Judge Fine's conclusion that Detective Saldate's role in Petitioner's conviction was minimal. Detective Saldate's only involvement in the case was arresting and fingerprinting Petitioner during a traffic stop more than a year after the victim's death. Doc. 23 at 13. Although Detective Saldate testified at trial concerning this arrest, he does not appear to have testified concerning the underlying actions for which Petitioner was ultimately convicted. *Id.* (citing Doc. 17-1 at 172-78).[1]

### B. Equitable Tolling.

A petitioner is entitled to equitable tolling of the statute of limitations if he establishes "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). The burden to show that equitable tolling applies lies with the petitioner. *Espinoza-Matthews v. California*, 432 F.3d 1021, 1026 (9th Cir. 2005). "[T]he threshold necessary to trigger equitable tolling under AEDPA is very high, lest the exceptions swallow the rule." *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir. 2002) (alterations incorporated).

Petitioner argues that his limited access to the prison law library, the law library's limited case law, and his ignorance of the law and procedural rules constitute "extraordinary circumstances." Doc. 24 at 10, 13-15. The Court does not agree. A *pro se* petitioner's ignorance of the law is not an extraordinary circumstance. *Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006); *Ballesteros v. Schriro*, No. CV-06-675-PHX-EHC (MEA), 2007 WL 666927, at *5 (D. Ariz. Feb. 26, 2007). Nor do ordinary prison limitations on access to legal materials constitute exceptional circumstances. *Ramirez v. Yates*, 571 F.3d 993, 998 (9th Cir. 2009); *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998). Petitioner has not met his high burden of showing that equitable tolling is warranted in this case.

---

[1] Detective Saldate appears to be mistakenly referred to as Detective Salgante in the transcript from Petitioner's trial. Doc. 17-1 at 20-28, 172-178.

### C. Actual Innocence and Evidentiary Hearing.

The ADEPA's statute of limitations does not apply to habeas petitions that make "a credible showing of actual innocence." *McQuiggin*, 133 S. Ct. at 1931. The petitioner must show that, if the new evidence had been presented at trial, "it is more likely than not that no reasonable juror would have convicted the petitioner." *Id*. at 1933 (citing *Schlup v. Delo*, 513 U.S. 298, 325 (1995)) (internal formatting omitted). To make such a showing, a petitioner must present "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. Examples include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Id.* The Court is not bound by rules of admissibility and may consider the probative value of relevant evidence that was wrongfully excluded, illegally admitted, or unavailable. *Id.* at 327-28.

A habeas petitioner "should receive an evidentiary hearing when he makes a good-faith allegation that would, if true, entitle him to equitable tolling." *Roy*, 465 F.3d at 969. The Ninth Circuit has not specifically "articulat[ed] a legal standard regarding when an evidentiary hearing on a gateway *Schlup* claim is required." *Stewart v. Cate*, 757 F.3d 929, 941 n.12 (9th Cir. 2014). It is clear, however, that conclusory allegations do not suffice. As *Schlup* explained, habeas courts are entitled to consider the "credibility of the affiants" and "probable reliability of [new] evidence" in deciding whether to hold an evidentiary hearing. 513 U.S. at 325. Implicit in this formulation is an understanding that the petitioner's allegations regarding the existence of new evidence must be plausible and substantiated by some sort of evidentiary submission.

Petitioner argues that he has shown actual innocence on four grounds relating to alleged newly discovered medical evidence:

(1) there is a history of "SIDS" in the family history[;]

(2) the state failed to disclose the fact that the collar bone injury to the victim was five days old. Making the grandmother's statements

- 10 -

>
> questionable regarding the child "climbing all over the furniture" on the day in question[;]
>
> (3) the injury would cause the victim to be in so much pain there would be no way the child would cry sporadically but cry with any movement of her arm[; and]
>
> (4) as the medical report by Dr. Arden shows the injury to the right arm could have come when the I.V. was placed in the child's arm during emergency treatment.

Doc. 24 at 12. Petitioner also requests that the Court grant him an evidentiary hearing "just to find out the extent of the Constitutional Violation of his Due Process rights." *Id.* at 11-12.

The fact that Petitioner has a family history of "SIDS" is not new evidence. Petitioner's nephew (a blood relative) died of SIDS in 1988, a fact known to Petitioner long before his trial. Additionally, Petitioner's family history is not sufficient to convince the Court that "it is more likely than not that no reasonable juror would have convicted the petitioner" had the juror considered this history. *McQuiggin*, 133 S. Ct. at 1933 (citation omitted). The trial included evidence not only of serious fractures to the clavicle and right arm, but also of petechial hemorrhaging consistent with suffocation, brain injuries consistent with suffocation, blood in the child's mouth, and Petitioner's unwillingness to call 911.

Petitioner asserts that he was unaware that the victim's collar bone injury was five days old at the time of the underlying incident, a fact that he appears to argue undermines the credibility of the Grandmother's testimony. But Petitioner does not point to anything in the record to support this fact or whether it was presented to the jury at his original trial.[2] And even if this evidence regarding the Grandmother's credibility is considered,

---

[2] The report of Dr. Arden states that characteristics of the collar bone injury suggest it was 1-2 weeks old when Angelica died. Doc. 7-2 at 41. As noted above, the child died five days after her injuries. In addition, it is not clear if the same conclusion was reached by other medical professionals who examined the victim or the victim's medical file. Further, Dr. Arden's report does not opine on the effect such an injury would have on the victim, but simply notes that it "cannot be used as evidence to support the conclusion that she was asphyxiated or smothered on [the day in question]." *Id.*

- 11 -

the Court does not find it more likely than not that no reasonable juror would have convicted Petitioner. As noted above, there was substantial evidence consistent with suffocation of the child.

Finally, Petitioner relies on Dr. Arden's 2009 report as newly discovered evidence of his actual innocence. As noted by Judge Fine, this report was considered by the Arizona Court of Appeals on collateral review in 2012. According to that court:

> Even if this claim was not precluded, the court finds the defendant failed to establish this evidence, if presented at trial, would have changed the outcome. At trial, the State presented evidence the baby appeared fine when she visited with her great-grandparents the week before October 21, 1996. The grandmother, with whom the defendant and baby resided, testified that the baby acted fine on the morning of October 21, 1996. When the grandmother left for work at 9:30 a.m. that day, the baby was in the apartment with the defendant. At approximately noon that day, the grandmother called the defendant and heard the baby crying in the background. At 12:30 p.m. that day, police were called to the apartment complex, they saw Simms. He told the officers he had no information about a crying baby. Simms later saw the defendant take the baby to the bedroom. Later, the defendant told him the baby had stopped breathing. Simms ran to the baby, thinking she was choking, placed her over his shoulder and applied pressure to her back. She spit up mucous and blood. Simms told the defendant to call 911. When the defendant did not do so, Simms went to get the officers he had seen earlier to help with the baby. . . .
>
> The opinions of Dr. Arden do not address all the facts presented at trial. In addition, Dr. Arden's report acknowledges that smothering is one mechanism that could cause anoxic encephalopathy, the cause of the baby's death.

Doc. 17-4 at 5-6.

The Court agrees with these observations. Dr. Arden's report concedes that the victim's injuries and eventual death could have been caused by smothering, but argues that there is insufficient evidence to show that they necessarily must have been caused by smothering. Doc. 7-2 at 36-43. As a result, the report concludes that her "death should have been certified as undetermined." *Id.* at 43. The report appears to be based on the same medical evidence available to the parties at trial. *Id.* A County Chief Medical

- 12 -

Examiner presented contrary testimony, concluding that the victim's injuries were in fact caused by smothering. Doc 17-1 at 190. The report does lead the Court to conclude that, had it been considered at trial, the outcome would have been different. *McQuiggin*, 133 S. Ct. at 1933 (citation omitted). Because Petitioner has not made a colorable claim of actual innocence, the Court need not reach his underlying claims and will not grant his request for an evidentiary hearing.

**IT IS ORDERED:**

1. Magistrate Judge Deborah M. Fine's R&R (Doc. 23) is **accepted.**
2. The Amended Petition for writ of habeas corpus (Doc. 7) is **denied** with prejudice.
3. The Clerk of the Court is directed to **terminate** this action.

Dated this 30th day of January, 2017.

_____
David G. Campbell
United States District Judge